1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TIO DINERO SESSOMS,

11            Petitioner,                    No. CIV S-05-1221 JAM GGH P

12        vs.

13   D. L. RUNNELS, Warden, et al.,

14            Respondents.                   FINDINGS & RECOMMENDATIONS

15   _____/

16   I.  Introduction and Summary

17            Petitioner is a state prisoner proceeding through counsel with a petition for a writ

18   of habeas corpus.  Petitioner challenges his 2001 conviction for murder (Cal. Penal Code §

19   187(a)), robbery (Cal. Penal Code § 211), and burglary (Cal. Penal Code § 459), with the special

20   circumstance that petitioner was engaged in the commission or attempted commission of the

21   crimes of robbery and burglary when the murder took place.  Petitioner is serving a sentence of

22   life in prison without the possibility of parole and additional determinate terms totaling fifteen

23   years.

24            This action is proceeding on the amended petition filed on May 5, 2006.

25   Petitioner raises the following claims: (1) his trial counsel rendered ineffective assistance by

26   failing to investigate and present evidence that his rights pursuant to Miranda v. Arizona, 384

1

1   U.S. 436 (1966), were violated by police officers during his interrogation; and (2) his rights

2   under the Fifth, Sixth, and Fourteenth Amendments were violated when interrogating police

3   officers ignored his unequivocal request for counsel.

4          In analyzing this close case, the undersigned emphasizes its closeness under the

5   correct AEDPA standard of review – unreasonableness in application of Supreme Court

6   authority.  The state court decision must be "jaw- dropping wrong" (i.e., even more than clear

7   error) – that after looking at all possible angles, the federal court asks rhetorically, what could the

8   state courts possibly have been thinking in that no legitimate argument supports the state court

9   finding when laid aside established Supreme Court authority.  The undersigned knows that a

10  petitioner will only rarely prevail under this standard as the state courts are as able to interpret

11  binding precedent as well as the undersigned.

12         In their well written presentations, petitioner's counsel and respondent's counsel

13  demonstrate that there are arguably legitimate, different legal resolutions to the issues presented.

14  One can validly argue that the Court of Appeal got it wrong, and it might well have, but the

15  undersigned cannot find that it was AEDPA unreasonable.  While the issues presented task the

16  brain, the jaw has not dropped.

17         With that said, the undersigned recommends that the petition be denied.

18  II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

19         The AEDPA "worked substantial changes to the law of habeas corpus,"

20  establishing more deferential standards of review to be used by a federal habeas court in

21  assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

22  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

23         In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

24  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

25  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

26  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

1    "unreasonable application of" that law. Id. at 1519.  "Contrary to" clearly established law applies

2    to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

3    Court on a point of law, or (2) if the state court case is materially indistinguishable from a

4    Supreme Court case, i.e., on point factually, yet the legal result is opposite.

5              "Unreasonable application" of established law, on the other hand, applies to

6    mixed questions of law and fact, that is, the application of law to fact where there are no factually

7    on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

8    Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

9    AEDPA standard of review which directs deference to be paid to state court decisions.  While the

10   deference is not blindly automatic, "the most important point is that an *unreasonable* application

11   of federal law is different from an incorrect application of law....[A] federal habeas court may not

12   issue the writ simply because that court concludes in its independent judgment that the relevant

13   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

14   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

15   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

16   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

17   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

18             The state courts need not have cited to federal authority, or even have indicated

19   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

20   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

21   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

22   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

23   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

24   established Supreme Court authority reviewed must be a pronouncement on constitutional

25   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

26   binding only on federal courts.  Early v. Packer, 123 S. Ct. at 366.

1    However, where the state courts have not addressed the constitutional issue in

2    dispute in any reasoned opinion, the federal court will independently review the record in

3    adjudication of that issue.  "Independent review of the record is not de novo review of the

4    constitutional issue, but rather, the only method by which we can determine whether a silent state

5    court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

6    2003).  In reviewing a state court's summary denial of a habeas petition, the court "looks

7    through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

8    F.3d 1072, 1079 n. 2 (9th Cir. 2000) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111

9    S.Ct. 2590 (1991)).

10    III.  Background

11    The opinion of the California Court of Appeal contains a factual summary.  After

12    independently reviewing the record and supplementing it with bracketed material for context, the

13    court finds this summary to be accurate and adopts it below.

14    Given the nature of the claims on appeal, a detailed recitation of
      the facts underlying defendant's convictions is not necessary.  In

15    short, defendant and two cohorts decided to rob Edward Sherriff.
      During the course of the robbery, one of the men choked Sherriff

16    and then repeatedly stabbed him.  In all, Sherriff was stabbed and
      slashed 24 times.  The men stole cash, jewelry, and the victim's

17    two vehicles.

18    Shortly thereafter, defendant left California for Oklahoma, where
      he ultimately turned himself in.  [Petitioner was Mirandized by

19    Oklahoma police after he turned himself into authorities on
      November 15, 1999; he refused to speak with the Oklahoma police

20    at that time.]  On November 19 or 20, 1999, [Sacramento]
      detectives interviewed defendant at a county jail in Oklahoma.  The

21    interview was videotaped. [fn] - Unbeknownst to petitioner, he was
      under video/audio surveillance from the time he entered the

22    interrogation room.  As the interview indicates, he was also
      separately audio recorded by the interrogating officers a short time

23    into the actual introduction/questioning.  The undersigned has
      personally viewed and listened to the pertinent parts of the

24    video/audio tape.
      Early in the interview, prior to being "Mirandized," the following

25    conversation occurred:

26    "[DEFENDANT]: There wouldn't be any possible way that I could

4

1          have a - a lawyer present while we do this?

2          "DET. WOODS: Well, uh, what I'll do is, um-

3          "[DEFENDANT]: Yeah, that's what my dad asked me to ask you
           guys ... uh, give me a lawyer.[1]
4
           "DET. WOODS: What - what we're going to do is, um - I have one
5          philosophy and that's, uh, be right up - front and be honest, the
           same way we were with [two other suspects], and not bullshit you
6          or try to hide anything from you, okay?

7          "[DEFENDANT]: Okay, sir my dad was worried about, about like,
           I'm not going to say how some detectives do it but like a lot of
8          officers end up switching your words afterwords [ sic ].

9          "DET. WOODS: No, we're not playing no switch games or nothing
           else. In fact, if - if you wouldn't mind, I'd like to -
10
           "[DEFENDANT]: So there-
11
           "DET. WOODS: - record whatever conversation we have and that
12         way there will be no-you know, it's recorded and there-there's proof
           that we ain't playing no switch games or nothing else.  Now, would
13         you mind if I pulled out a recorder?

14         "[DEFENDANT]: No."

15         Officers did not stop the interview.  However, they did not ask
           defendant any questions.  Detective Woods told defendant he was
16         being charged with homicide, robbery, and burglary, and that his
           cohorts had waived their rights and given statements to the police.
17         The detective also indicated that if defendant told them he would
           not speak to officers without an attorney present, they would not be
18         able to talk and get defendant's version of the events.

19         Detective Woods then told defendant he was going to advise him
           of his rights and make sure he understood those rights and then
20         defendant could decide whether he wanted to speak with the
           detectives.  Defendant asked if it would be possible for him to call
21         his father; since he was over 18 years old, Detective Woods said no
           but that they could make arrangements when they were finished
22         talking.

23         Detective Woods next advised defendant of his rights under

24
           ───────────────────
           [1]  When Detective Woods subsequently listened to the videotape of petitioner's police
25    interrogation and compared it to the written transcript, he testified that petitioner actually said
      "get me a lawyer," and not "give me a lawyer."  (Reporter's Transcript on Appeal (RT) at 23, 36-
26    37.)

                                            5

Miranda.  After having been fully advised of those rights, defendant indicated he understood them.  Detective Woods then asked whether defendant wanted to talk to them now, and defendant said, "Let's talk."  Defendant gave a lengthy statement to the police, in which he admitted his involvement in the robbery and murder.

Prior to trial, defendant sought to have his statement to the detectives suppressed, claiming he had "clearly and unequivocally requested the assistance of an attorney."  The court conducted an evidentiary hearing on the motion, heard argument, and watched the videotape of the interview.  The court denied the motion, finding that defendant's initial statement was not an assertion of his rights but a question.  The court noted that following defendant's question, the officers did not ask him any questions until after defendant was Mirandized and waived those rights.  Accordingly, the court concluded that "there was no [ Miranda ] violation, [and] that the officers were not required to terminate the interrogation."

The jury found defendant guilty of first degree murder and found the special circumstances allegations true; they also found him guilty of first degree robbery and first degree burglary.

Prior to sentencing, defendant filed a motion for a new trial, alleging the trial court had erred in failing to suppress his statements.  The court again reviewed arguments from both sides, spent hours reviewing the videotape, and reviewed the transcript of the tape.  The court reiterated its finding that defendant's initial statement to the officers about a lawyer was a question, not a "direct unequivocal request to be provided with an attorney on the spot."  The court did not find that a reasonable officer would have heard defendant say get me a lawyer.  It noted that even if a reasonable officer would have heard that, it was not an unequivocal request for counsel.  "Rather, [defendant] was just stating what his father's wishes were, not his own."  Accordingly, the court denied the motion for a new trial on this ground.

The court sentenced defendant to life without possibility of parole. The court also imposed a restitution fine of $10,000 (§ 1202.4, subd. (b)) and suspended an additional restitution fine in the same amount pending successful completion of parole (§ 1202.45).

(Exhibit 3 to Declaration of Eric Weaver No. 1 (hereinafter Opinion), filed on May 5, 2006.)

The record also reflects the following undisputed facts.  After Detective Woods turned on the tape recorder at petitioner's interrogation, the following colloquy took place:

DET. WOODS:  Oh.  It's nine twenty – twenty-six, and we're in a, uh – a interview room at the Oklahoma County Sheriff's Office Detention Center in Oklahoma City with Tio and Pat (Keller) and

1   Dick (Woods).  Um, want to back up.  This way there – is a
recording, and you know we can't play no switch games or nothing
2   else.  Uh, I want to back up to your question you asked about an
attorney.  Um, first, before you ask questions, uh, I'm going to tell
3   you why we're here, just lay it out and be up - front.  And then –
then I'm going to advise you of your rights.  And then it's up – for
4   you to decide if you want the attorney or not.

5   T. SESSOMS:  All right.

6   DET. WOODS:  Um, we obviously you know that the – the
warrant is – is charging you with homicide and robbery and
7   burglary.

8   T. SESSOMS:  Uh-huh.

9   DET. WOODS:  And, um, all three of you are charged with the
same thing.  There's no difference, uh, in Adam's charges or
10   Frederick's charges or – and we're working on the other part of it.
But there's no difference in anybody's charges.  Um, I don't know
11   how long you've known Frederick, how long you've known Adam,
how long you've known Joseph or any – anybody.  Uh, but we do
12   know what happened, and I'm not going to lie or buffalo or bullshit
you.  Uh, Frederick waived his rights, which surprised me, and laid
13   it out from A to Z.  Adam also waved [sic] his rights and laid it out
from A to Z.  And we believe, due to what Adam and Frederick
14   both told us, that you yourself did not participate in the stabbing.
And I have no reason not to believe that.  Now, there's two sides to
15   every story, or three sides or four sides.  But the situation is you
brought up attorney.  We – if you said you didn't want to make any
16   statement without an attorney, we're not really going to be able to
talk to you and get your version of it.  Uh, most all attorneys – in
17   fact, all attorneys will – will sometimes or usually advise you not
to make a statement.  But – and – and we don't need to have your
18   statement to make this case because we've already got two and a
half other complete statements.  And we know what happened, and
19   it's accurate with the evidence at the scene.  So we know it's not
being made up, what Adam and Fred said.  Uh, we've got quite a
20   bit of some of the property back except for currency.

21   SESSOMS:  What's that?

22   DET. WOODS:  Money.  Uh, we still don't have a lot of the coins
or the bills back, but we've got jewelry and jewelry boxes back, the
23   Bible, and so forth.  And you are a suspect in it, and we are – you –
obviously, you were arrested in this and --
24
T. SESSIONS:  I turned myself in.
25
DET. WOODS:  I know.  Which – which I think is good, okay?
26   But, uh, what I want to do is, um – I'm not trying to take any rights

7

1   away from you or anything else.  What I want to do, Tio, is advise
2   you of your rights, make sure you understand them.  Then you
    make the decision if you want to talk to us or not.

3   T. SESSOMS:  Uh-huh.

4   (Clerk's Transcript (CT) at 549-52.)  The detectives asked petitioner how old he was, and

5   petitioner responded that he was nineteen.  (<u>Id.</u> at 552.)  Petitioner asked, "Would it be a possible

6   chance that I can call my dad?"  (<u>Id.</u>)  Detective Woods responded, "well, no, because . . . you've

7   got to make your decision."  (<u>Id.</u> at 553.).  Woods told petitioner that he could not speak to his

8   father until after they were "done talking to you," and that he had to make his own decision

9   because he was "an adult."  (<u>Id.</u>)  Petitioner was then advised of his constitutional rights,

10  including his rights to remain silent and to have the presence of an attorney during questioning.

11  (<u>Id.</u> at 553-54.)  The following colloquy then occurred:

12  DET. WOODS:  Okay.  Having these rights in mind, do you wish
    to talk to us now?
13
    T. SESSOMS:  Um --[2]
14
    DET. WOODS:  That's solely up to you.
15
    T. SESSOMS:  Let's talk.
16

17  (<u>Id.</u> at 554.)

18          The record reflects that petitioner turned himself in to Oklahoma authorities with

19  the knowledge and assistance of his father.  (Declaration of David Hinds Jr. (Hinds declaration),

20  filed on May 5, 2006, at 2.)  Petitioner's father arranged for petitioner to surrender to Oklahoma

21  police officer David Hinds.  (<u>Id.</u> at 2.)  Officer Hinds transported petitioner to the Langston

22  Police Department.  (<u>Id.</u>)  At the police station, Police Chief Gregory Bufford read petitioner his

23  <u>Miranda</u> rights.  (<u>Id.</u>; Declaration of Gregory Bufford (Bufford declaration), filed on May 5,

24  2006, at 1.)  Chief Bufford asked petitioner whether he wanted to "make a statement" and

25

26  _____

    [2]  This court's review of the videotape of petitioner's interrogation reflects that petitioner
    shrugged his shoulders at this point and made a short pause before responding.

1   petitioner responded, "No." (Hinds declaration at 2; Bufford declaration at 2.) As a result of

2   petitioner's invocation of his right to remain silent, he was not questioned by Oklahoma

3   authorities. (Id.) Petitioner was subsequently transferred to Oklahoma City to await extradition

4   to California. (Hinds declaration at 3.) A few days later, California police officers Woods and

5   Keller arrived to question petitioner and extradite him to California. (Hinds declaration at 3;

6   Bufford declaration at 2.) At that point, the interrogation described above took place.

7           Roseann Cerrito, a private investigator licensed in California who was retained by

8   petitioner's trial counsel to investigate the charges against petitioner, told petitioner's trial

9   counsel on at least three occasions that petitioner had invoked his Miranda rights when he was

10  taken into custody in Oklahoma. (Declaration of Roseann Cerrito (Cerrito declaration), filed on

11  May 5, 2005, at 2.) Trial counsel told Ms. Cerrito that "it did not matter that Mr. McEwan [sic]

12  invoked his Miranda rights to the officers in Oklahoma because Mr. Sessoms had given his

13  statement to Sacramento Police Officers." (Id.) Trial counsel did not ask Ms. Cerrito to contact

14  Oklahoma police officers Hinds and Bufford, and Cerrito did not do so. (Id.) Petitioner also

15  informed his trial counsel "a minimum of three times" that he had invoked his constitutional

16  rights when he was questioned by Oklahoma police officers Bufford and Hinds. (Declaration of

17  Tio Dinero Sessoms (Sessoms declaration), filed on May 5, 2005, at 2.) Petitioner's trial counsel

18  declares that he has "no current recollection of being informed by Mr. Sessoms or Ms. Cerrito

19  that Mr. Sessoms invoked his Miranda rights to the officers who took Mr. Sessoms into custody

20  in Oklahoma." (Declaration of Howard McEwan (McEwan declaration), filed on May 5, 2006,

21  at 2.) Counsel states that he did not call anyone in Oklahoma to inquire about these claims and

22  did not have a tactical reason for not doing so. (Id.)

23  IV.  Petitioner's Claims

24       A.  Ineffective Assistance of Counsel

25           Petitioner's first claim is that his trial counsel rendered ineffective assistance by

26  failing to investigate and present evidence that his constitutional rights were violated by

1   Sacramento Detectives Woods and Keller during his interrogation.  He argues that because of

2   counsel's deficient investigation, he failed to discover that petitioner had invoked his <u>Miranda</u>

3   rights when he was first questioned by Oklahoma Detectives Hinds and Bufford.  Petitioner

4   claims that if counsel had conducted a full investigation into the circumstances of the

5   interrogation, he could have filed a successful suppression motion arguing that his questioning by

6   Sacramento deputies Woods and Keller violated his rights pursuant to <u>Michigan v. Mosley</u>, 423

7   U.S. 96, 97-98 (1975).  (Petitioner's Memorandum of Points and Authorities in Support of

8   Amended Petition (P&A) at 18-26; Traverse at 4-5.)[3]

9           Petitioner raised this claim for the first time in a petition for writ of habeas corpus

10  filed in the Sacramento County Superior Court on April 16, 2004.  (page 9 of Exhibit 6 to

11  "Declaration of Eric Weaver No. 1," filed on May 5, 2006.)  On May 20, 2004, the Superior

12  Court denied the petition without specifically mentioning this claim.  (Ex. 7 to "Declaration of

13  Eric Weaver No. 1.")  On May 27, 2004, petitioner wrote a letter to the California Superior

14  Court, in which he reiterated his claim that his trial counsel rendered ineffective assistance when

15  he failed to conduct sufficient investigation of his interrogation by Oklahoma  police.  (Ex. 8 to

16  "Declaration of Eric Weaver No. 1.")  The Superior Court treated this letter as a request for

17  reconsideration and denied petitioner's claim of ineffective assistance of counsel, citing <u>In re</u>

18  <u>Dixon</u>, 41 Cal.2d 756, 759 (1953).  (Ex. 9 to "Declaration of Eric Weaver No. 1.")  On May 27,

19  2004, petitioner filed a petition for writ of habeas corpus in the California Supreme Court, in

20  which he argued that his trial counsel rendered ineffective assistance by failing to discover that

21  petitioner invoked his <u>Miranda</u> rights when questioned by Oklahoma authorities.  (page 9 of

22

23           [3] In the amended petition, petitioner argues that Sacramento Detectives Keller and
24  Woods violated his constitutional rights as articulated in <u>Edwards v. Arizona</u>, 451 U.S. 477,
    484-85 (1981) (describing the procedures police must follow when a suspect requests a lawyer)
25  when they questioned him after he had invoked his <u>Miranda</u> rights.  (Am. Pet. at 4-5; P&A at 21-
    24.)  In the traverse, petitioner abandons his reliance on <u>Edwards</u> because he did not expressly
26  invoke his right to counsel when he spoke to Detectives Hinds and Bufford.  (Traverse at 4.)
    Petitioner now relies on <u>Michigan v. Mosley</u> in support of this claim.  (Traverse at 4-10.)

1  Exhibit 3 to "Declaration of Eric Weaver No. 2," filed on May 5, 2006.)  That petition was

2  summarily denied.  (Exhibit 4 to Declaration of Eric Weaver No. 2.)  On September 20, 2004,

3  petitioner filed another petition for a writ of habeas corpus, in which he raised the same claim.

4  (Ex. 5 to Declaration of Eric Weaver No. 2.)  That petition was denied with a citation to In re

5  Waltreus, 62 Cal.2d 218 (1965).  (Ex. 6 to Declaration of Eric Weaver No. 2.)

6          As set forth in the brief, the first claim, the Mosley ineffective assistance claim,

7  was decided in a welter of post-direct review habeas petitions.  Because the various courts either

8  missed the issue or it was not presented clearly, the decisions include no rulings, procedural

9  denials, reconsideration denials on the merits and silent denials.  The undersigned will review the

10 Mosley issue independently under the proper AEDPA standard.

11      1.  Applicable Law

12          a.  Ineffective Assistance of Counsel

13          The Sixth Amendment guarantees the effective assistance of counsel.  To support

14 a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the

15 circumstances, counsel's performance fell below an objective standard of reasonableness.

16 Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  After a petitioner identifies the acts or

17 omissions that are alleged not to have been the result of reasonable professional judgment, the

18 court must determine whether, in light of all the circumstances, the identified acts or omissions

19 were outside the wide range of professionally competent assistance.  Id. at 690; Wiggins v.

20 Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of counsel claim "[t]here

21 is a strong presumption that counsel's performance falls within the 'wide range of professional

22 assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S.

23 at 689).  There is in addition a strong presumption that counsel "exercised acceptable

24 professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702

25 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).  However, "'a single, serious error may

26 support a claim of ineffective assistance of counsel' – including counsel's failure to file a motion

1  to suppress." <u>Moore v. Czerniak</u>, ___ F.3d ___, 2008 WL 2875453 (9th Cir. (Cal.)) at *8

2  (quoting <u>Kimmelman</u>, 477 U.S. at 383 (1986).

3          Second, a petitioner must establish that he was prejudiced by counsel's deficient

4  performance. <u>Strickland</u>, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

5  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

6  been different." <u>Id.</u> at 694.  A reasonable probability is "a probability sufficient to undermine

7  confidence in the outcome." <u>Id.</u>  <u>See also</u> <u>Williams</u>, 529 U.S. at 391-92; <u>Laboa v. Calderon</u>, 224

8  F.3d 972, 981 (9th Cir. 2000).  In cases involving counsel's failure to file a suppression motion,

9  the question of prejudice is governed by <u>Arizona v. Fulminante</u>, 499 U.S. 279, 308 (1991).

10  <u>Czerniak</u>, 2008 WL 2875453 at *7.  In order to establish prejudice, petitioner must demonstrate

11  that a motion to suppress would have been meritorious and that counsel's failure to file such a

12  motion fell below an objective standard of reasonableness. <u>Id.</u> at *8.  The analysis must be

13  conducted with an awareness that "a confession is like no other evidence," and that "a full

14  confession may have a 'profound impact' on the jury." <u>Fulminante</u>, 499 U.S. at 296.  This court

15  must "exercise extreme caution" before determining that counsel's failure to file a motion to

16  suppress petitioner's confession was non-prejudicial. <u>Id.</u>

17          In determining an ineffective assistance claim on an assertion that an attorney

18  performed deficiently on potential legal issue in the trial court, the two prongs, for the most part,

19  overlap.  That is, to the extent that the outcome of the legal issue would clearly have been in

20  favor of petitioner had it been raised, it is likely that the attorney had no reasonable tactical

21  decision in not raising the issue.   The court will thus tackle the prejudice issue, i.e., the legal

22  issue in question, first.

23          b.  <u>Merits of a Motion to Supress Petitioner's Confession</u>

24          "The prosecution may not use statements, whether exculpatory or inculpatory,

25  stemming from custodial interrogation of the defendant unless it demonstrates the use of

26  procedural safeguards effective to secure the privilege against self-incrimination." <u>Miranda v.</u>

1    Arizona, 384 U.S. at 444.  To this end, custodial interrogation must be preceded by advice to the

2    potential defendant that he has the right to consult with a lawyer, the right to remain silent and

3    that anything stated can be used in evidence against him.  Id. at 473-74.  Miranda warnings are

4    "'not themselves rights protected by the Constitution but [are] instead measures to insure that the

5    right against compulsory self-incrimination [is] protected.'"  Oregon v. Elstad, 470 U.S. at 305

6    (quoting Michigan v. Tucker, 417 U.S. 433, 444 (1974)).

7            Once Miranda warnings have been given, if a suspect makes an unambiguous

8    statement invoking his constitutional rights, "all questioning must cease."  Smith v. Illinois, 469

9    U.S. 91, 98 (1984).  See also Miranda, 384 U.S. at 473-74; Michigan v. Mosley, 423 U.S. at 100.

10   Any subsequent statements are relevant only to the question whether the accused waived the right

11   he had previously invoked.  Smith, 469 U.S. at 98.  "Invocation and waiver are entirely distinct

12   inquiries, and the two must not be blurred by merging them together."  Id.

13           As explained above, petitioner relies on Michigan v. Mosley in support of his

14   claim of ineffective assistance of counsel.  Mosley involved the following fact pattern:

15           Before his initial interrogation, Mosley was carefully advised that
             he was under no obligation to answer any questions and could
16           remain silent if he wished.  He orally acknowledged that he
             understood the Miranda warnings and then signed a printed
17           notification-of-rights form.  When Mosley stated that he did not
             want to discuss the robberies, Detective Cowie immediately ceased
18           the interrogation and did not try either to resume the questioning or
             in any way to persuade Mosley to reconsider his position.  After an
19           interval of more than two hours, Mosley was questioned by another
             police officer at another location about an unrelated holdup
20           murder.  He was given full and complete Miranda warnings at the
             outset of the second interrogation.  He was thus reminded again
21           that he could remain silent and could consult with a lawyer, and
             was carefully given a full and fair opportunity to exercise these
22           options.

23   423 U.S. at 104-05.  The issue raised in Mosley was whether "the conduct of the [second set of

24   police interrogators] that led to Mosley's incriminating statement did in fact violate the Miranda

25   'guidelines,' so as to render the statement inadmissible in evidence against Mosley at his trial."

26   Id. at 100.  Resolution of that issue involved the interpretation of the following passage set forth

                                                    13

in the <u>Miranda</u> decision:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.  At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.  Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

384 U.S. at 473-474.

The Supreme Court rejected a per se proscription of any further interrogation once the person questioned has indicated a desire to remain silent, holding instead "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under <u>Miranda</u> on whether his 'right to cut off questioning' was 'scrupulously honored.'" <u>Mosley</u>, 423 U.S. at 104.  As the Supreme Court explained, "[a] reasonable and faithful interpretation of the <u>Miranda</u> opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . ." <u>Id.</u> at 103-04 (quoting <u>Miranda</u>, 384 U.S. at 479).  "The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." <u>Id.</u> (quoting <u>Miranda</u>, 384 U.S. at 474.)

A reviewing court must look to all of the circumstances to determine if a person's right to remain silent has been violated.  <u>Mosely</u>, 423 U.S. at 96.  The court in <u>Mosley</u> considered the amount of time that had elapsed between the two interrogations, the provision of fresh <u>Miranda</u> warnings, the scope of the second interrogation, and the zealousness of officers in pursuing questioning after the suspect had asserted his right to remain silent.  <u>See</u> <u>Id.</u>, 423 U.S. 104-6; <u>United States v. Hsu</u>, 852 F.2d 407, 410 (9th Cir. 1988).  However, "[a]t no time ... did the Court [in <u>Mosley</u> ] suggest that these factors were exhaustive, nor did it imply that a finding as to one of the enumerated factors--such as, for example, a finding that only a short period of

time had elapsed--would forestall the more general inquiry into whether, in view of all relevant

circumstances, the police 'scrupulously honored' the right to cut off questioning." <u>Hsu</u>, 852 F.2d

at 410.  In reaching the conclusion that Mosley's confession was valid, the Supreme Court

specifically noted that there was no evidence the police "failed to honor a decision of a person in

custody to cut off questioning, either by refusing to discontinue the interrogation upon request or

by persisting in repeated efforts to wear down his resistance and make him change his mind."

<u>Mosley</u>, 423 U.S. at 105-106.  Indeed, the police did not "in any way [attempt] to persuade

Mosley to reconsider his position."  <u>Id.</u> at 104.[4]

       In <u>Hsu</u>, the suspect entered a Sears store and was arrested inside by Agents Kuehl

and Valentine.  852 F.2d at 409.[5]  The agents brought Hsu outside the store.  (<u>Id.</u>)  Valentine read

Hsu his <u>Miranda</u> rights and he agreed to waive them.  (<u>Id.</u>)  After answering a few questions, Hsu

asked if he could remain silent.  (<u>Id.</u>)  Agent Valentine said that he could and stopped the

interview.  (<u>Id.</u>)  Another agent then placed Hsu in her car and drove him to the a house where a

search was being conducted.  After participating in the search, a different agent (Hill) approached

the car where Hsu was waiting.  (<u>Id.</u>)  Hill did not know that Hsu had previously invoked his

right to silence.  (<u>Id.</u>)  Hill advised Hsu of his <u>Miranda</u> rights, he waived them, and confessed.

(<u>Id.</u>)  At issue was whether "the interrogation by Agent Hill violated Hsu's fifth amendment right

not to incriminate himself."  (<u>Id.</u>)

       The Ninth Circuit concluded that petitioner's right to remain silent was

scrupulously honored because the agents immediately ceased questioning when Hsu expressed a

---

[4]  Although the second round of questioning in <u>Mosley</u> concerned a different crime than the first round, several circuits, including the Ninth Circuit, have concluded that the fact that two interrogations involve the same subject matter is insufficient to render the second interrogation unconstitutional.  <u>See</u> <u>e.g.</u>, <u>Hsu</u>, 852 F.2d at 410; <u>United States v. House</u>, 939 F.2d 659, 662 (8th Cir. 1991).

[5]  Although Supreme Court holdings are the only source of clearly established law under the habeas corpus statute, circuit court holdings are persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court law.  <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir. 2003).

1    desire to remain silent, changed location, and provided fresh <u>Miranda</u> warnings.  The court

2    appeared to particularly focus on whether the police used pressure on the suspect to extract

3    information and whether a fresh set of <u>Miranda</u> warnings was given.  (<u>Id.</u> at 410.)  The court

4    specifically noted that Hsu did not "contend that DEA agents harassed him, or even that they

5    pressured him in any way to revoke his assertion of the right to remain silent."  (<u>Id.</u>)  On the

6    contrary, the record demonstrated that Agent Hill "exerted no pressure upon Hsu whatsoever,"

7    but merely "read Hsu his rights a second time, and Hsu responded with a valid waiver."  (<u>Id.</u> at

8    412.)

9            In <u>United States v. Barone</u>, 968 F.2d 1378 (1st Cir. 1992), the First Circuit

10   concluded that a confession was obtained in violation of <u>Mosley</u> where the defendant resisted

11   questioning, was held for over 24 hours, was interrogated four times before he began to discuss

12   the crime, and was twice intimidated by suggestions that he "would be in substantial [physical]

13   danger if he returned to Boston without cooperating."  <u>Id.</u> at 1385.  The First Circuit concluded

14   that "the focus on danger, the failure to repeat warnings, the increasing length of incarceration,

15   the officers' efforts to ingratiate themselves, and the number of encounters deliberately aimed at

16   eliciting cooperation on the same crime are sufficient to support a finding that this was a case

17   'where the police failed to honor a decision of a person in custody to cut off questioning, ... by

18   persisting in repeated efforts to wear down his resistance and make him change his mind.'"  <u>Id.</u> at

19   1386 (quoting <u>Mosley</u>, 423 U.S. at 105-06).

20       2.  <u>Analysis</u>

21            a.  <u>Would A Motion to Suppress Have Been Meritorious?</u>

22            In this case, as described above, petitioner invoked his right to silence and

23   declined to speak to Oklahoma deputies Hinds and Bufford when he turned himself in on

24   November 15, 1999.  Petitioner was then transported to the Oklahoma County jail in Oklahoma

25   City.  Five days later, he was interviewed by Sacramento deputies Woods and Keller.  First of all,

26   it was not wrong *per se* for the Sacramento detectives to attempt to interrogate petitioner.  After

all, petitioner had turned himself into authorities (implying a possible desire to cooperate), and it had been four days since any questioning had taken place.  The Sacramento authorities did not "keep petitioner in custody;" there was no way petitioner was going to be released on murder charges pending extradition proceedings or a waiver thereof.  However, the Sacramento detectives had to be careful about the way they commenced the interview lest it be found straight away that they were not sensitive to the fact that he had previously refused to speak, and if petitioner continued his desire not to speak, to "scrupulously honor" the continued desire to remain silent.

It is quite apparent that the detectives were taken back by petitioner's statement about an attorney right out of the box.  More will be said about that in the following section.  However, the Mosley implication was that petitioner did not desire to cut off questioning, he was simply asking about an attorney before the substantive questions were to commence.  Petitioner followed that initial statement up with a statement about his Dad thinking that petitioner should ask for an attorney because of a perceived fear that the detectives would "switch words" if an attorney was not present.  Again, petitioner is not asking to be left alone or to be silent – he is making statements about being counseled during the questioning.  The detectives marched right up to the line of coercive conduct under the circumstances by initially ignoring petitioner's attorney question, and then "counseling" petitioner that the other two suspects had given complete statements.  Then the detectives told petitioner that if he wanted the police to hear his side of the story (of course, there was no benefit to petitioner from the police hearing his side of the story), he needed to tell them then.  The police offered their opinion that an attorney would advise petitioner to make no statement; however, this advice cuts both ways in that this comment might well convince petitioner that if lawyers would not allow a statement, then maybe he should not make one.

However, the Sacramento detectives drew back from the line.  They fairly quickly came back to petitioner's question about an attorney.  They informed petitioner that he would be

advised about his rights, "[a]nd then it's up-- for you to decide if you want an attorney or not."
Petitioner was also told: "I'm not trying to take any rights away from you or anything else.  What
I want to do, Tio, is advise you of your rights, make sure you understand them.  Then you make
the decision if you want to talk to us or not."  When after being advised of his Miranda rights and
being asked if he wished to waive his <u>Miranda</u> rights before substantive questioning, he was
advised: "That's solely up to you."   And this re-advice of rights, according to <u>Hsu,</u> is the most
important factor in finding the absence of a <u>Mosley</u> violation.

      All in all, petitioner had every opportunity to persist in <u>remaining </u>silent, or getting
a lawyer, but he chose to say, and rather quickly: "Let's talk."  Here as in <u>Mosley</u>, a significant
amount of time elapsed between the first and second interrogations.  There is no evidence that
petitioner suffered from harsh treatment while in custody.  The Sacramento police officer's
statements were not unduly coercive, and the preface to advice of rights did not last for a long
time.  Petitioner was not threatened with more years in prison if he did not talk; the officers did
not relate that petitioner would be given any specific benefit if he gave his statement.  Petitioner
was not given the "parade of prison horribles" with the implicit representation that such might
not occur if he gave a statement.  Of course, the Sacramento detectives were desirous of getting a
statement having traveled from California to Oklahoma.  But it cannot  be said from an AEDPA
standpoint that the preface to questioning amounted to wearing down petitioner's initial steadfast
resolve not to talk; as previously noted, petitioner did not once indicate that he desired to remain
silent.

      This is not to say that petitioner's arguments find no support in case law applying
Supreme Court authority.  It is to say that respondent's arguments find enough support in case
authority that a district court would be hard pressed to say that a motion to suppress would surely
have been granted.[6]  And it appears that the cases which did find a <u>Mosley</u> problem described

---

[6]     The undersigned uses the word "surely" advisedly.  The undersigned must find not only
that the probable outcome would have been different, or that his confidence in the outcome is

1  situations more severe than that presented here.  See United States v. Olof, 527 F.2d 752, 753

2  (9th Cir. 1975) (suspect's right to cut off questioning was not scrupulously honored where police

3  used psychological pressure to induce the suspect to confess, telling him "that prison was a 'dark

4  place,' where they 'pumped air' to the prisoners"); Barone, 968 F.2d at 1385 n.10 ("the use of

5  accurate information [when talking to the suspect] does not weigh in [the government's] favor if

6  done for the purpose of pressuring the defendant to abandon his right to remain silence"); United

7  States v. Schwensow, 151 F.3d 650, 659 (7th Cir. 1998) ("the constitutionality of a subsequent

8  police interview depends not on its subject matter but rather on whether the police, in conducting

9  the interview, sought to undermine the suspect's resolve to remain silent").  But cf. United States

10  v. Pheaster, 544 F.2d 353, 366, 368 (9th Cir. 1976) (court concluded that defendant voluntarily

11  waived his right to silence when assertions by the police consisted of "objective, undistorted

12  presentation[s]," stressing the "key distinction between questioning the suspect and presenting

13  the evidence available against him.").

14          The court therefore finds insufficient prejudice for petitioner's first claim – the

15  Mosley ineffective assistance of counsel claim.  For all the reasons set forth above, after an

16  independent review of the record, the undersigned does not find that the California courts were

17  unreasonable in determining that counsel was not ineffective for not raising a Mosley issue on

18  account of insufficient prejudice.  There is no need to determine whether reasonable counsel

19  would have made a Mosley suppression motion in any event.

20          B.  Miranda Warnings/Request for Counsel

21          Petitioner's next claim is that California detectives Woods and Keller improperly

22  ignored his unequivocal request for counsel and, instead of terminating the interview, actively

23  sought to convince him to speak to them without an attorney.  (P&A at 28-30.)  The California

24  _____

25  undermined, but that it would be unreasonable for the state courts, in their silent denials, to have
   applied Supreme Court authority and not have had their confidence undermined based on

26  Mosely.  See Sessoms v. Runnels, 2006 WL 3734131 (E.D . Cal. 2006), citing Bell v. Cone, 534
   U.S. 685, 698-699, 122 S.Ct. 1843, 1852 (2002).

Court of Appeal denied this claim, reasoning as follows:

> Defendant contends the police obtained his confession only after disregarding his unequivocal request for an attorney. He thus asserts the confession is inadmissible and all counts must be reversed. (Edwards v. Arizona (1981) 451 U.S. 477, 485-487 [68 L.Ed.2d 378] (Edwards); Miranda, supra, 384 U.S. at p. 474.) In reviewing this claim, we defer to the trial court on questions of fact and decide the Miranda/Edwards issue de novo. (People v. Bradford (1997) 14 Cal.4th 1005, 1032-1033.)
>
> "Under the familiar standards of Miranda, ... a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent. [Citations.]" (People v. Sims (1993) 5 Cal.4th 405, 440 (Sims ).) "Once having invoked these rights, the accused 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.' (Edwards [,supra,] 451 U.S. [at pp. 484-485].)" (Sims, supra, 5 Cal.4th at p. 440.)
>
> For the Miranda/Edwards prohibitions against further questioning to apply, a suspect's invocation of the right to counsel must be clear and unequivocal. (Davis v. United States (1994) 512 U.S. 452, 460-462 [129 L.Ed.2d 362] (Davis).) The application of Edward's "'"rigid" prophylactic rule' " requires the court to determine whether the suspect "'actually invoked' " his right to counsel. (Id. at p. 458.) "To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry." (Id. at pp. 458-459.)
>
> "Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' [Citation .] But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, [it does] not require the cessation of questioning." (Davis, supra, 512 U.S. at p. 459.) "Rather, the suspect must unambiguously request counsel." (Ibid.)
>
> "'[A] statement either is such an assertion of the right to counsel or it is not.' [Citation.] Although a suspect need not 'speak with the discrimination of an Oxford don,' [citation], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect. [Citation.]" (Davis, supra, 512 U.S.

1    at p. 459.)

2    In the present case, although defendant twice explicitly referred to
     an attorney, neither statement was an unequivocal or unambiguous
3    request for counsel.  On the first occasion, defendant asked, "There
     wouldn't be any possible way that I could have a ... lawyer present
4    while we do this?"  As the court found, this was a question, not an
     unambiguous request.  Defendant's second reference to an attorney
5    was "Yeah, that's what my dad asked me to ask you guys ... uh,
     give me a lawyer."

6
     We find defendant's first statement is legally indistinguishable
7    from the equivocal remarks in Davis, "'Maybe I should talk to a
     lawyer'" (Davis, supra, 512 U.S. at p. 455), and in People v.
8    Crittenden (1994) 9 Cal.4th 83, 123 ( Crittenden ), "'Did you say I
     could have a lawyer?'"  These equivocal remarks in Davis and
9    Crittenden were not requests for counsel triggering the Edwards
     rule.  (Davis, supra, 512 U.S. at p. 462.)  Similarly, "[i]n the
10   present case, defendant did not unequivocally state that he wanted
     an attorney, but simply asked a question." (Crittenden, supra, 9
11   Cal.4th at p. 130.)

12   Nor was defendant's second reference to an attorney an
     unequivocal request for an attorney.  At best, it was a statement of
13   his father's advice to him.  We cannot find such a statement to be
     "sufficiently clear[ ] that a reasonable police officer in the
14   circumstances would understand the statement to be a request for
     an attorney." (Davis, supra, 512 U.S. at p. 459.)

15
     However, even if these statements were somehow construed to be
16   actual invocations of defendant's right to counsel such that
     defendant's Miranda rights were violated, under the particular
17   circumstances of this case, any such violation did not taint the
     subsequent confession that was obtained in accordance with
18   Miranda .

19   In Oregon v. Elstad (1985) 470 U.S. 298 [84 L.Ed.2d 222]
     (Elstad), the United States Supreme Court held that failure to give
20   a young adult defendant his Miranda warnings prior to his
     confession to burglary did not taint that defendant's subsequent
21   confession, given after officers read his Miranda rights and he
     agreed to speak with them.  Although "Miranda's preventive
22   medicine provides a remedy even to the defendant who has
     suffered no identifiable constitutional harm" (id. at p. 307), "[i]t is
23   an unwarranted extension of Miranda to hold that a simple failure
     to administer the warnings, unaccompanied by any actual coercion
24   or other circumstances calculated to undermine the suspect's
     ability to exercise his free will, so taints the investigatory process
25   that a subsequent voluntary and informed waiver is ineffective for
     some indeterminate period.  Though Miranda requires that the
26   unwarned admission must be suppressed, the admissibility of any

                                    21

1
subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." (Id. at p. 309.)

2

3
This case is even more compelling than Elstad in that here, defendant did not make any incriminating statements until after having been advised of and waiving his Miranda rights.  At the time defendant made his remarks about an attorney he had not been Mirandized.  At that time, defendant had also not made any statements about the robbery and murder of Sherriff, and the officers had not asked any questions about the night of the crimes.  Following defendant's two references to an attorney, the officers did not ask him any questions at all.  Instead, they fully advised him of his Miranda rights.  After being fully advised of his Miranda rights and indicating he understood those rights, Detective Woods asked if defendant wanted to talk to them and he replied, "Let's talk."  Defendant makes no argument, and there is no evidence, that there was any defect in the advisement of rights or the waiver, or that it was not voluntary and informed.  Accordingly, there was no Miranda violation.

4

5

6

7

8

9

10

11
Because defendant's incriminating statements were not the product of a Miranda violation, the trial court correctly declined to exclude them on that ground.

12

13
(Opinion at 5-9.)

14
In support of his claim in this regard, petitioner argues that his choice of words

15
was meant to convey his request for counsel "in a respectful fashion" and that the fact his

16
invocation was in the form of a question should not be construed as "equivocation on his part."

17
(P&A at 29.)  Petitioner notes that his polite way of asking questions was apparent throughout

18
the interview.  (Id.)  He explains that his remark about his father simply clarified why he wanted

19
an attorney and was not meant to convey his father's wishes as separate from his own.  (Id. at

20
30.)  Petitioner also contends that after he made his request, the police improperly "badgered"

21
him into waiving his right to counsel.  (Id. at 29-30.)

22
1.  Applicable Law

23
In Edwards v. Arizona, the United States Supreme Court held that law

24
enforcement officers must immediately cease questioning a suspect who has clearly asserted his

25
right to have counsel present during custodial interrogation.  451 U.S. at 484-85.  A suspect

26
must "unambiguously request counsel," which means that he "must articulate his desire to have

22

1  counsel present sufficiently clearly that a reasonable police officer in the circumstances would

2  understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452,

3  459 (1994).  "[I]f a suspect requests counsel at any time during the interview, he is not subject to

4  further questioning until a lawyer has been made available or the suspect himself reinitiates

5  conversation." Edwards, 451 U.S. at 484-85.  The Supreme Court has stated that Edwards

6  establishes a "'rigid' prophylactic rule." Smith v. Illinois, 469 U.S. at 95 (citing Fare v. Michael

7  C., 442 U.S. 707, 719 (1979)).  This requirement is "designed to prevent police from badgering a

8  defendant into waiving his previously asserted Miranda rights." Davis, 512 U.S. at 458 (quoting

9  Michigan v. Harvey, 494 U.S. 344, 350 (1990)).

10         The United States Supreme Court has recognized that "[o]n occasion, an

11  accused's asserted request for counsel may be ambiguous or equivocal." Smith v. Illinois, 469

12  U.S. at 95.  For instance, in Davis, defendant's statement, "Maybe I should talk to a lawyer" was

13  insufficient to constitute an invocation of the right to counsel.  Similarly, the Ninth Circuit Court

14  of Appeals has concluded that utterances which include the words "might," "maybe," or

15  "perhaps" should generally be deemed ambiguous. Robinson v. Borg, 918 F.2d 1387, 1393-94

16  (9th Cir. 1990) (citing cases). See also Arnold v. Runnels, 421 F.3d 859, 865 (9th Cir. 2005)

17  ("where a suspect's request for counsel is qualified with words such as 'maybe' or 'might,' we

18  have concluded that the suspect did not unambiguously invoke his right to counsel"); Clark v.

19  Murphy, 331 F.3d at 1066 (defendant's statement "I think I would like to talk to a lawyer" was

20  ambiguous, and therefore the police were not required to cease questioning); Robtoy v.

21  Kincheloe, 871 F.2d 1478, 1482 (9th Cir. 1989) ("maybe I should call my attorney" deemed an

22  equivocal request for counsel).  The Ninth Circuit has also found requests for counsel to be

23  equivocal when the defendant asks the police whether they think he should get a lawyer. See

24  e.g., United States v. Ogbuehi, 18 F.3d 807, 813 (9th Cir. 1994) (defendant's question, "Do I

25  need a lawyer" or "Do you think I need a lawyer" does not "rise to the level of even an equivocal

26  request for an attorney").  Questions that raise uncertainty about whether the suspect actually

1    wants a lawyer are also equivocal assertions of the right to counsel.  See e.g., United States v.

2    Younger, 398 F.3d 1179, 1187 (9th Cir. 2005) (defendant's statement "[b]ut, excuse me, if I am

3    right, I can have a lawyer present ... through all this, right?" does not constitute unambiguous

4    invocation of right to counsel).  Notwithstanding the above examples, the Ninth Circuit has

5    recognized that "[o]ur own precedent is not much help since it is somewhat inconsistent on what

6    constitutes an equivocal request for a lawyer."  Clark v. Murphy, 331 F.3d at 1070.  However, if

7    a suspect "makes a reference to an attorney that is ambiguous or equivocal in that a reasonable

8    officer in light of the circumstances would have understood only that the suspect *might* be

9    invoking the right to counsel," the police are not required to stop the interrogation.  Davis, 512

10   U.S. at 459 (emphasis added).

11          Where an involuntary confession is improperly admitted into evidence at trial, a

12   reviewing court must apply a harmless error analysis, assessing the error "in the context of other

13   evidence presented in order to determine whether its admission was harmless beyond a

14   reasonable doubt."  Fulminante, 499 U.S. at 308.  In the context of habeas review, the standard is

15   whether the error had substantial and injurious effect or influence in determining the jury's

16   verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Beatty v. Stewart, 303 F.3d 975,

17   994 (9th Cir. 2002); Henry v. Kernan, 197 F.3d 1021, 1029 (9th Cir. 1999).

18          2. Discussion

19          Petitioner argues that he invoked his right to counsel at the beginning of the

20   interview with Detectives Woods and Keller and that the admission of his subsequent statements

21   against him at trial violated his rights under Miranda v. Arizona.  (Am. Pet. at 5.)  The resolution

22   of this issue turns on whether petitioner's statements: "There wouldn't be any possible way that I

23   could have a – lawyer present while we do this?" and "Yeah, that's what my dad asked me to ask

24   you guys . . . uh, give [get] me a lawyer," constitute an unequivocal request for counsel.  The

25   California courts concluded that petitioner's statements did not constitute an unequivocal request

26   for counsel.  The question before this court is whether the state courts' conclusion in this regard

1    is an unreasonable application of clearly established United States Supreme Court authority

2    and/or an unreasonable determination of the facts of this case.[7]

3          Petitioner argues that his request for counsel is "strikingly similar" to the request

4    made by the defendant in Alvarez v. Gomez, 185 F.3d 995, 998 (9th Cir. 1999).  In that case, the

5    Ninth Circuit concluded that, when considered together, a suspect's three questions: "(1) Can I

6    get an attorney right now, man?; (2) You can have attorney right now?; and (3) Well, like right

7    now you got one?" constituted an unambiguous request for counsel.  Although phrased as

8    questions, it was clear that the suspect in Alvarez wanted an attorney "right now."  Similarly, in

9    Smith v. Endell, 860 F.2d 1528 (9th Cir. 1988), the Ninth Circuit deemed "Can I talk to a

10   lawyer?" a clear invocation of the right to counsel.  Id.  In Robinson, "I have to get me a good

11   lawyer, man" and "Can I make a phone call?" were deemed a clear invocation of the right to

12   counsel.  918 F.2d at 1389.

13         In the situation presented here, although close, the undersigned cannot find that

14   the Court of Appeal was AEDPA unreasonable in its determination that no unequivocal request

15

16         [7]  The California Court of Appeal also concluded that, even if petitioner made an
     unequivocal request for counsel, his statements were admissible pursuant to Oregon v. Elstad,
17   270 U.S. 298 (1985).  Petitioner argues that the holding in Elstad is "completely inapposite" to
     the issue presented here.  (P&A at 33.)  In response, respondent argues that even if the state
18   appellate court incorrectly relied on Elstad, the court correctly determined that petitioner did not
     make an unequivocal request for counsel.  (Answer at 32.)  In Elstad, the defendant made a
19   voluntary incriminating statement without first being given the requisite Miranda warnings.  One
     hour later, he was advised of and waived his Miranda rights and executed a written confession.
20   The Supreme Court held that "a suspect who has once responded to unwarned yet uncoercive
     questioning is not thereby disabled from waiving his rights and confessing after he has been
21   given the requisite Miranda warnings."  470 U.S. at 318.  Pursuant to the holding in Elstad, a
     defendant's voluntary statement which is inadmissible solely on the ground of a Miranda
22   violation does not taint a subsequent voluntary statement.  Id. at 298, 306, 309.  The issue
     presented here, on the other hand, is whether petitioner made an unequivocal request for counsel.
23   If he did, "a valid waiver of [the right to counsel] cannot be established by showing only that he
     responded to further police-initiated custodial interrogation even if he has been advised of his
24   rights."  Edwards, 451 U.S. at 484-85.  Petitioner is correct that the holding in Elstad has no
     applicability to the issues raised in the instant habeas petition.  Respondent essentially concedes
25   this point.  Accordingly, that part of the state court decision which relies on Elstad is contrary to
     United States Supreme Court authority and cannot provide the basis for denying petitioner's
26   Miranda claim.

1   for counsel had been made.  Petitioner's first statement was an oddly stated "negative possibility"

2   question:  "There wouldn't be any possible way....."  If petitioner had asked affirmatively,

3   "would it be possible....," petitioner's argument that a reasonable person would have understood

4   such as a direct request for counsel would be on much stronger ground.  It may be that the

5   interrogating detective knew full well that he was now on tenuous grounds because he made no

6   immediate attempt to answer the question.  Perhaps, the detective was trying to buy time to figure

7   out whether an unequivocal request had been made.  However, the test here is not what the

8   detective subjectively understood; it is an objective test which inquires whether a reasonable

9   police questioner would have understood this negative possibility question as an unequivocal

10  request for counsel.  And in this AEDPA context, in order to rule for petitioner, the undersigned

11  must find that no reasonable court would find that the request was equivocal.

12          Of course, petitioner's follow-up statement that his Dad had asked him to ask

13  about an attorney adds to petitioner's case.  But again, this is an odd way to ask for counsel

14  oneself – putting that request in words making it appear to be the request of an absent person.

15  The police are not responsible for the unique way in which petitioner was seeking counsel.  The

16  undersigned is not being critical of petitioner; but if his way of directly asking for counsel is to

17  approach the request in an obscure manner, the law will not recognize such as an unequivocal

18  request.  The Edwards claim cannot be sustained.

19  Conclusion

20          Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED that

21  petitioner's application for a writ of habeas corpus be denied.

22          These findings and recommendations are submitted to the United States District

23  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

24  days after being served with these findings and recommendations, any party may file written

25  objections with the court and serve a copy on all parties.  Such a document should be captioned

26  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

1  shall be served and filed within ten days after service of the objections.  The parties are advised

2  that failure to file objections within the specified time may waive the right to appeal the District

3  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

4  Dated: 09/08/08

5                                                              /s/ Gregory G. Hollows

6                                                              _____

7  ggh:8                                                United States Magistrate Judge
   sessoms1221.hc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26